[Crim. No. 6843. Second Dist., Div. One. Sept. 23, 1960.]

THE PEOPLE, Respondent, v. JACK M. O'HARA et al., Defendants; LLOYD D. WOODS, Appellant.

Russell E. Parsons and Harry E. Weiss for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

WOOD, P. J.—By information, the defendants O'Hara and Woods were accused of grand theft in violation of section 487, subdivision 1, of the Penal Code in that on or about November 7, 1958, they did unlawfully and feloniously take $500, the personal property of Donald Giovanni. In a trial by jury they were convicted. They appealed from the judgment and the order denying their motions for a new trial. O'Hara died, and his appeal has been dismissed. Woods will be referred to as the appellant.

Appellant contends: (1) that the information was not sufficient to notify the defendant of a specific act constituting a public offense, and by reason thereof defendant was not afforded an opportunity to prepare a defense; and that section 952 of the Penal Code (which provides for a short form of information) is unconstitutional in that it seeks to dispense with procedural due process of law which requires reasonable notice of the offense charged and a fair opportunity to prepare a defense; (2) the evidence was insufficient to support the verdict; (3) the court erred in not rearraigning the appellant after the information had been amended, during the trial, so that the alleged year-date of the crime would be 1958 instead of 1957; (4) the court erred in permitting the prosecution to "play" a recording of appellant's conversation.

There was evidence, as follows: About November 3, 1958, while Don Giovanni (complaining witness) was in a liquor bar on Ventura Boulevard in Los Angeles, he met defendant Woods for the first time. In a conversation between them, Woods said that he was an actor, golf player, gambler, a cheater in card games, and he played cards with wealthy persons. Giovanni said that he was an actor, writer, gambler, and that he had worked in a gambling place in Reno where he dealt cards. Woods asked Giovanni if he would like to be a partner of Woods, in playing cards for money, wherein Woods would cheat by giving Giovanni a good hand. Giovanni said he thought that was a good idea. Woods said he did not have enough money for a big game, and that $1,000 or $2,000 would be needed. Giovanni said he thought he could get $2,000. Woods said there was a game "up north" and that Giovanni

might go there with him, and he would let Giovanni know the next day. The next morning, while they were at Woods' apartment, Woods said that he could not go up north to play cards, but he thought he would have a better proposition, and he would let Giovanni know about it on the next day. The next day Woods told Giovanni by telephone that Woods' girl friend, who worked on the switchboard at General Motors in Van Nuys, had introduced him to a fellow who had been collecting race bets inside the plant, that the fellow had been collecting for his supervisor who was a superintendent, that the superintendent had been transferred about two weeks previously and now "the fellow" was superintendent (in place of the one who had been transferred), and that the book was approximately "a thousand to fifteen hundred" and the fellow needed a bank roll in order to start bookmaking "themselves." Giovanni said he had about $2,000. Woods said that would come in "handy" in collecting the race book. After Giovanni said he would be interested, Woods said he would call the fellow and make an appointment. Woods and Giovanni went, in Woods' car, "to the front entrance" of the General Motors plant. Woods said that "the fellow was getting off shift pretty soon," and they were to meet him in front of the building. Woods said that he was not interested in the bookmaking, and he did not want the fellow to know that he (Woods) was connected with the bookmaking, and he would introduce them and then it would be up to them. A man came from a place which appeared to be the employees' entrance, and Woods introduced the man by saying, "This is Chuck"; and he introduced Giovanni by saying, "This is Don." The man who came there was the defendant O'Hara. Giovanni stated his own last name and asked the man his last name. O'Hara and Woods said, "What's the difference, the last name? We just know each other as Don, Chuck and Jack." O'Hara entered the car, and then Woods said, "This is the fellow I was talking to you about." O'Hara (Chuck) said he worked there and he had been collecting bets for his supervisor, but he had not been doing that during the last two weeks because his supervisor had been transferred. O'Hara also said that the supervisor did everything he could do to keep from being transferred, because he had such a lucrative gambling business—he collected from $1,000 to $2,000 a day in bets; that the bets ranged from $1.00 to $5.00, but occasionally there were $10 bets. Giovanni asked why O'Hara did not take the business. He replied that he did not have enough money.

O'Hara said that the employees were anxious to start betting again because they had not bet since the other fellow left. It was agreed between Giovanni and O'Hara that Giovanni would receive 25 per cent of the winnings. After Giovanni inquired again regarding "Chuck's" last name, Chuck (O'Hara) said his last name was McDonald. Giovanni said, "How do I know that you are working in there?" Woods said, "I told you he works there, and he works there." Giovanni said, "All right. It's all arranged." O'Hara said that he would collect the bets and figure out everything, and would hand the bets to Giovanni; and that both of them could keep a record. O'Hara and Woods insisted that they start the betting on the next day, Friday, because that was pay day and the men were anxious to bet. Giovanni agreed to start the next day, and they (O'Hara and Giovanni) made an arrangement to meet the next day near the General Motors plant. O'Hara was late in arriving at the appointed place and he said he was late because there was a big line by the time clock and he could not get out sooner. In response to a question by Giovanni, O'Hara said he had the bets and he wanted to make a copy of them, but he could not do it there because the fellows in the plant would see him and he would lose his job. O'Hara said he had rented a hotel room and that they could get the copying done quickly at the hotel and he had to be back at the plant within an hour. They went, in Giovanni's car, to the Chase Hotel which was several blocks away from the plant. They entered room 11, which was dark, and O'Hara told Giovanni to turn the light on. The lamp plug and the television plug were out of the electric sockets and the cords were twisted. After approximately three minutes, Giovanni turned the light on. At that time O'Hara was sitting at a table upon which there were cards, paper, and a pencil. The cards were betting markers pertaining to horse races—there were approximately 200 cards. O'Hara told Giovanni to "read off" the cards while he (O'Hara) did the writing. After O'Hara had made a record of approximately half of the cards, O'Hara read the cards while Giovanni did the writing. After the copying had been finished, O'Hara gave the cards to Giovanni, and he (O'Hara) kept the paper on which the card information had been copied. While they were returning to the plant, Giovanni asked if he could see O'Hara's identification card. O'Hara replied, "What's the difference if I have an identification card?" After returning to the plant, Giovanni went to a bank in Beverly Hills and withdrew $500. Then he went home,

looked at the newspapers, and started to "figure out" the winners and losers. Giovanni noticed that three of the cards had a $10 parlay. (He explained that a parlay is a bet on a horse in a particular race, and also a bet on a horse in a succeeding race, and if the horse in the first race wins then the amount won in that race is bet on the horse in the succeeding race—with the result a person who wins a parlay wins a great deal of money.) Giovanni "figured" that they had lost about $4,000 on those bets, and he figured that the eastern races, involved in the bets, had been run before O'Hara gave the cards to Giovanni. (He explained that he met O'Hara at 9:50 a.m., and the eastern races were run at 10:04 a.m. Los Angeles time, and the results were available at 10:05 a.m. He explained that he believed that O'Hara mixed the parlay cards with the other cards while Giovanni was trying to fix and turn on the light in the dark room.) Upon examining the other bets (small bets) he figured the losses thereon were about $500. While Giovanni was at home, defendant Woods telephoned him and asked, "How did you do?" He replied that they had lost about $4,000. Woods, after saying that was tough, asked if Giovanni could get that much money. He replied in the negative, and said further that Chuck (O'Hara) had "past-posted us." Woods said that Chuck was a square guy and would not do a thing like that. Giovanni asked for O'Hara's telephone number at the plant. Woods replied that it would be impossible for Giovanni to get him, but that he (Woods) would make the call because his girl friend was on the switchboard. Later, O'Hara telephoned Giovanni and said that Woods had told him that "you got hit." O'Hara, after saying that he figured they lost about $3,000, asked how much money Giovanni had. He replied that he did not have very much. About 8 p.m. on that day (November 7) Giovanni and Woods started to the plant for the purpose of talking to O'Hara. On the way there Giovanni said that he had only $500, but that the balance of the $2,000 was in San Diego. Woods said that he might be able to help them with some money. When they saw a police vehicle, Woods said that "all we need now is for a police car to stop us with . . . these cards." Woods also said that he had been in quite a bit of trouble with the police, that he shot and killed a fellow who had made a bet with him and did not pay. After meeting O'Hara at the plant, they went to a parking lot near a store and "started to figure it out." They figured that they lost about $3,000. O'Hara, after saying he had collected about $950 in bets, asked how they were going to

pay the boys who won. Woods said that it was "one of those things" and that Giovanni will get the dough. O'Hara said he had about $600 and could borrow $600 from the credit union at the plant. Woods said he would put $500 in. O'Hara said to Giovanni, "Give me the money." Woods also told him to give the money to O'Hara. While Giovanni was "taking the money out to hand it" to O'Hara, Woods took the money from Giovanni's hand, counted it, and said, "500.00. Okay." Then Woods handed the money (Giovanni's money) to O'Hara. Also, Woods said, "Here's my money," and at that time he handed a "roll of money" to O'Hara. Then Woods said that Giovanni had to get the "rest" of the money and that he "had better go" to San Diego and get the money "by tomorrow [Saturday]." Giovanni said he could not get the money from the bank on Saturday. O'Hara told him to get it on Monday, and then call Woods and tell him where they would meet O'Hara and give the money to him. Then they took O'Hara to the plant. On the way to Woods' apartment, Woods said that Giovanni "had better get" the money and that he (Woods) did not want "to be stuck" for his $500. The next morning Giovanni told Woods that he could not go to San Diego because he was sick. Woods told him to get the money. On Monday, Giovanni told Woods that he did not have the money. Woods said that Giovanni "better get the money" or he would put Giovanni in the hospital, that he would "beat up" Giovanni, that he would not mind going to jail for beating or killing Giovanni, that he had been in jail, and that Giovanni "had better get" $500 for him or he would kill Giovanni. The next day, Woods telephoned Giovanni and made statements similar to those he had made on the previous day. O'Hara telephoned on that day and said he was going to kill somebody if he lost his job on account of this betting. The next morning (November 11) Giovanni notified the police. Thereafter, Woods asked Giovanni by telephone if he had the money. He replied that he could not pay. Then Woods said that he was coming to Giovanni's room, break the door down, and "beat you up," and one guy is going to the hospital and the other one is going to jail. The police went to Giovanni's room and, with his permission, attached a recording device to his telephone. Woods telephoned Giovanni and made statements similar to those he had made previously with reference to threatening Giovanni, and those statements included much vile language. In the recorded statements, Woods said he gave $500 to Giovanni and he wanted his money, and that if "you

call the cops'' and O'Hara loses his job he (O'Hara) will ''gun for both of us.'' After the conversation, Giovanni telephoned Woods and said that he had changed his mind and wanted to pay, but he wanted O'Hara present. Then they agreed to meet at a restaurant on Ventura Boulevard. When they met there, the police arrested Woods and O'Hara. After the arrest, Giovanni learned that the person whom he knew as Chuck McDonald was the defendant O'Hara.

Mr. Haddad, a witness called by the prosecution, testified as follows: He first met O'Hara on Armistice Day in November, 1958, in Burbank near a corner of the Lockheed plant. The witness, his brother, and one Brookshire went to that place in the witness' car. Brookshire introduced O'Hara as ''Chuck.'' O'Hara entered the car and said that they should go around the block so that they could talk. He drove to a certain place and parked his car. O'Hara said that about $1,000 of bookmaking money was coming out of Lockheed every day, and that the fellow who was there previously was transferred and O'Hara was taking over the bookmaking because he was timekeeper and had access to the whole plant. O'Hara said he would collect the bets in the plant and meet Haddad every morning at 9:15 near the plant, and he would bring the betting slips. Haddad ''was to bank roll the whole affair,'' and O'Hara was to receive 20 per cent of the winnings. The next morning Haddad went to the agreed place of meeting, and O'Hara came there and said he had betting slips for approximately $1,100. O'Hara said they had to go to a motel in order to copy the bets. They went to the Apache motel which was several blocks from the plant. For a while O'Hara read the slips and Haddad did the writing, and then Haddad read and O'Hara did the writing. They left the motel about 10:45 a.m. They agreed to meet on Monday to make the payoff. On Saturday O'Hara telephoned Haddad and said that a horse ''hit him in a parlay.'' According to the way Haddad ''figured'' the slips, he lost $2,300 the first day. They met near the plant on Monday and Haddad paid the $2,300 to O'Hara. O'Hara brought more slips with him. A man by the name of ''Harry'' came there with O'Hara, and O'Hara said that he had to return to the plant and that Harry would help Haddad copy the slips. Harry and Haddad went to the same motel and copied the slips. That afternoon O'Hara telephoned Haddad and said that there ''was one big parlay that missed.'' According to the way Haddad figured the slips, he lost $2,000

on the second set of slips. They met that evening and Haddad paid $2,000 to O'Hara.

Miss Hood, a witness called by the prosecution, testified that she was an employee of the Chase Hotel; that the hand-written information on the hotel registration card (Exhibit 1 herein) was written by defendant Woods: she was on duty at the registration window on November 7 when Woods "filled in" the card; he asked for a room for a short period of time; he rented room 11 and she gave the key to him.

A representative of the personnel department of General Motors at Van Nuys testified that he searched the personnel records of said company to ascertain whether a person by the name of Charles McDonald, or Jack O'Hara, or Jack Whalen had been employed by the company; the result of the search was that there was no indication that any person by any of those names ever worked there. He testified further that there was no credit union there.

A representative of the personnel department of Lockheed testified that there was no record that Charles McDonald or Jack O'Hara or Jack Whalen was employed by Lockheed.

Officer Holmes testified that, in a conversation with Woods at the police station, Woods said: that he did not know O'Hara very well; he went to the restaurant (on the night of the arrest) because Giovanni owed money to him; he knew nothing of the connection between O'Hara and Giovanni; he never met O'Hara until he went into the restaurant; he had spoken to O'Hara on the parking lot (before going into the restaurant) but he (Woods) had nothing to say about their conversation; he never threatened Giovanni; he lent $500 to Giovanni; he borrowed $380 of that amount from the Security Bank, and he borrowed the remainder of that amount from the owner of a bar; he did not want to say anything about O'Hara and himself.

Officer Marshall testified that when he entered the barroom, on the evening of the arrest, Giovanni was sitting at the counter; he (witness) sat at the counter near Giovanni; thereafter Woods came in and sat next to Giovanni; he (witness) heard Woods say, "McDonald ought to be here any minute"; either Woods or Giovanni said, "I wonder what's keeping him?"; then Woods said, "Oh, here is Mac now"; Woods and Giovanni said, "Hi, Mac"; soon thereafter O'Hara said, "Let's get out of here"; as they were going out the door, O'Hara and Woods were arrested.

Appellant Woods testified that he restricted his gambling to

cards and golf; he did not "play the horses"; he first met Giovanni in October, 1958, after Giovanni had telephoned him and said that he wanted to talk business with him; they met the next day in a café at the apartment house where Woods lived, and they discussed Giovanni's gambling activities in Nevada; a few days later they talked about Woods' gambling capabilities; Woods said that he (himself) was a good golfer and good card player; Giovanni suggested that they rent a home in Hollywood and then bring persons there for gambling purposes; Woods said he was not interested; on another occasion Giovanni said he had $2,000 that he could work with, and he would like to bet on golf games played by Woods; Woods said that Giovanni might lose money in betting on Woods' golf games; on November 6, 1958, Giovanni asked Woods if he ever did any bookmaking on horse races; Woods said he had not done that, but he knew a fellow who probably would give "some action" in bookmaking; then Woods called O'Hara and told him that a fellow would like to meet him and discuss bookmaking; about 30 minutes thereafter, O'Hara came to the café where Woods and Giovanni were, and then Woods introduced them as "Jack" and "Don"; Woods said that each of them (Jack and Don) was "All right"; then Woods left the place; the next evening, Giovanni told Woods that he had trouble the first day of "bookmaking" and he had lost about $1,300; he also asked that Woods help "straighten things," since Woods had introduced O'Hara; that evening they met O'Hara at a parking lot on Ventura Boulevard, and O'Hara and Giovanni had a discussion about the loss; Giovanni said he could not pay until Monday; O'Hara said that Giovanni should pay "tonight" so that they could pay the bets "tomorrow"; Giovanni asked Woods if Woods could "help him out" until Monday; Woods replied that he would help "with $500" if Giovanni would "have this money back for me Monday"; Giovanni said he would repay it before Monday; then Woods handed $500 to Giovanni; then Giovanni handed that money and an additional amount of $500 to O'Hara (making a total of $1,000 paid to O'Hara); Giovanni promised to pay "the balance of the money" to O'Hara; on Monday, Woods telephoned Giovanni and asked him about paying the $500; Giovanni said that he could not get the money; he also said, "Well, we lost"; Woods replied, "You might have lost," but "we" did not lose; Woods also said, "I loaned you my money" and "you go get me my money"; later they had "quite some words together" because Giovanni was trying

to "declare me his partner." Further testimony of Woods was to the effect that he did not say anything about knowing the switchboard operator at General Motors; he did not write on the registration card of the Chase Hotel; he had never been in that hotel; he had never seen the lady who testified herein that she was an employee of that hotel; he never met with O'Hara and Giovanni near the General Motors plant; he never made any arrangement to participate with O'Hara and Giovanni in any bookmaking activity; on November 7, about 8:30 a.m., he went into a barber shop in Hollywood and he remained there about an hour; also on that morning he was in Devore's clothing store in Hollywood where he bought a sweater.

The barber, referred to in Woods' testimony, corroborated Woods' testimony concerning his presence at the shop on November 7. A representative of the clothing store, referred to, corroborated Woods' testimony concerning his presence at the store.

O'Hara did not testify.

As above stated, appellant contends that the information did not notify him of a specific act constituting a public offense, and by reason thereof he was not afforded an opportunity to prepare a defense; and that section 952 of the Penal Code (providing for a short form of information) is unconstitutional in that it seeks to dispense with procedural due process of law which requires reasonable notice of the offense charged and a fair opportunity to prepare a defense. The information alleged, as above shown, that the defendants were accused of grand theft in violation of section 487, subdivision 1, of the Penal Code in that on or about November 7, 1958, they did unlawfully and feloniously take $500, the personal property of Donald Giovanni. He argues that since the code describes various kinds of theft (such as embezzlement, false pretenses, and trick and device), and since the information does not show what kind of theft was committed, and since the information does not allege the specific act of taking the money with an intent to deprive the owner thereof, the essential elements of the crime were not set forth with such particularity as to give appellant proper notice of the crime charged. Section 952 of the Penal Code provides: "In charging an offense, each count shall contain, and shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical aver-

ments. . . . It may be in the words of the enactment describing the offense or declaring the matter to be a public offense, or in any words sufficient to give the accused notice of the offense of which he is accused. In charging theft it shall be sufficient to allege that the defendant unlawfully took the labor or property of another.'' Appellant argues further that the last sentence of section 952 (just quoted) is in conflict with constitutional ''provisions for due process.'' In *People* v. *Ashley*, 42 Cal.2d 246 [267 P.2d 271], it was said at page 258: ''Indictments and information charging the crime of 'theft' can now simply allege an 'unlawful taking.' (Pen. Code, §§ 951, 952.) Juries need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved. [Citations.] The elements of the several types of theft included within section 484 have not been changed, however, and a judgment of conviction of theft, based on a general verdict of guilty, can be sustained only if the evidence discloses the elements of one of the consolidated offenses.'' ██ It is not necessary to allege the particular kind of theft committed. (*People* v. *Nor Woods*, 37 Cal.2d 584, 586 [233 P.2d 897].) ██ It is not necessary to allege specifically an intent to steal. (*People* v. *Israel*, 91 Cal.App.2d 773, 778 [206 P.2d 62].) It is to be assumed that, in the proper performance of official duty, the defendant was given a copy of the transcript of the preliminary examination. In *People* v. *Jones*, 61 Cal.App.2d 608 [143 P.2d 726], it was said at pages 615 and 616: ''An accusation drawn in conformance with statutory requirements is sufficient. . . . The reasons for the technical requirements at common law no longer exist. Properly to accuse a person under existing procedure he must be provided with a copy of the testimony heard by the grand jury or by the committing magistrate. By the testimony and the concise accusation he is fully advised.'' Said section 952 of the Penal Code, as it applies to the information herein, is not unconstitutional. The contention herein to the effect that the information is insufficient is not sustainable.

██ Appellant contends further that the evidence was not sufficient to support the verdict. He argues that the evidence shows he introduced O'Hara to Giovanni and that he did not participate in the transaction between them; that Giovanni is a disgruntled man who lost money in a gambling transaction and he is using this criminal proceeding in an attempt to avoid repaying the $500 which appellant lent to him. The

jury disbelieved appellant. On appeal, under such circumstances, the evidence must be viewed in the light favorable to the prosecution. The jury could reasonably infer from the evidence that appellant knowingly made false statements to Giovanni regarding O'Hara's alleged connection and activities at General Motors. The registration clerk at the Chase Hotel identified appellant as the person who signed the registration card and received the key. Appellant denied the testimony of the clerk and testified further that he had never been at that hotel. Appellant testified that after he had introduced O'Hara and Giovanni at the restaurant he (appellant) went away from the restaurant and left O'Hara and Giovanni there, and he did not hear anything further about the gambling transaction until the next evening when Giovanni telephoned him and told about the loss on the first day of betting. The effect of appellant's testimony, in that respect, was that he denied that he went to the General Motors plant with Giovanni, and that he denied he was with Giovanni when O'Hara came from a place which appeared to be the employees' entrance to General Motors. Also, he expressly denied that he went to the plant with Giovanni. There was evidence that, when Giovanni told appellant that O'Hara had "past-posted" them, appellant proceeded to defend O'Hara by stating that O'Hara was a square guy and would not do a thing like that. The jury could reasonably infer from the evidence that, when Giovanni wanted to telephone O'Hara at the plant, appellant tried to protect O'Hara and the scheme by telling Giovanni that only the appellant could "get through" the switchboard to O'Hara. There was evidence that appellant introduced O'Hara under a fictitious name and aided O'Hara in avoiding disclosure of O'Hara's surname. Other evidence indicating that appellant participated in the transaction was that, after Giovanni told him that money had been lost on betting, appellant said he had killed a man who failed to pay a bet. The jury could infer from that statement and from threats of personal injury made later that appellant was attempting to cause Giovanni to pay the loss allegedly shown by the fraudulent betting slips. The jury could reasonably infer from the evidence that appellant was a participant with O'Hara in the transaction involving Giovanni. The evidence was sufficient to support the verdict.

 Appellant also contends that the court erred in not rearraigning the appellant after the information had been amended, during the trial, so that the alleged year date of the

crime would be 1958 instead of 1957. On the third day of the trial and during the cross-examination of Giovanni, the deputy district attorney said: "My attention has been called to the information in this case where it states that the offense took place on or about the 7th day of November, 1957. Obviously that is a misprint, and I move that the date 1957 be amended by interlineation to read 1958." The motion was granted. The motion was not opposed and there was no objection to the amendment. There was no motion for a continuance. Neither defendant made any comment regarding the motion or amendment. Thereupon counsel for defendant Woods (appellant) continued to cross-examine Giovanni. This contention with reference to the amendment is made for the first time on appeal. Appellant argues that by reason of the amendment (changing the year date from 1957 to 1958) he could not adequately prepare for trial. Section 1009 of the Penal Code provides: ". . . The court . . . may . . . permit an amendment of an . . . information . . . for any defect or insufficiency, at any stage of the proceedings . . . . The defendant shall be required to plead to such amendment or amended pleading forthwith, or, at the time fixed for pleading, if he has not yet pleaded and the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination. . . ." In the matter of *In re Newbern*, 53 Cal.2d 786 [3 Cal.Rptr. 364, 350 P.2d 116], it was said at page 790: "[T]he mere change in the date on which the crime is alleged to have been committed will not encompass a requirement of additional time in which to prepare a defense unless the defendant was actually misled or otherwise prejudiced by such change." In *People* v. *Walker*, 170 Cal.App.2d 159 [338 P.2d 536], an information which alleged unlawful "possession" of heroin was amended by interlineation, at the trial, to allege unlawful "sale" of heroin. The defendant therein did not object to the amendment, and stated that he would not object thereto. In that case the defendant was not arraigned on the amended information and did not plead thereto. It was said therein (p. 164): "[W]here an amended pleading is filed by the district at-

torney in open court pursuant to statute, and the accused . . . offers no objection, makes no motion for continuance, and nothing is called to the court's attention to show that by making such amendment the substantial rights or any rights of the defendant are prejudiced, he may not for the first time raise the point on appeal. [Citations.] Nor do we find merit in appellant's contention that he was deprived of an arraignment and plea on the amended information. . . . Although section 1009 . . . provides that 'defendant shall be required to plead to such amendment or amended pleading forthwith,' we perceive here no violation of defendant's substantial or constitutional right or any prejudice to him because his plea was not entered to the amended charge, for he secured all the advantages of a plea of not guilty regularly entered. The court proceeded to trial on his plea to the offense alleged in the original information and defendant at all times received the benefit of a plea of not guilty, since the cause was tried as though such a plea had been interposed to the amended information. Defendant's substantial rights suffered no detriment by reason of the failure to repeat the plea [citation]." In the present case it appears, as stated in *People* v. *Vance*, 138 Cal.App.2d 871, 874 [292 P.2d 552], that appellant acquiesced in the course pursued. ▮ Appellant herein testified that he first met Giovanni in October, 1958. It is reasonable to conclude that appellant was not surprised or misled by the amendment which changed the year date to 1958, which was the year in which appellant and Giovanni met for the first time. Also, it is to be noted that appellant's alleged alibi pertained to the 1958 date—he presented testimony to the effect that on the 1958 date he was in a barber shop and a clothing store. Appellant argues further that if he had had an opportunity to enter a plea to the amended information he would have been entitled to proceed under section 995 of the Penal Code (to move to dismiss on the ground that there was no probable cause for committing him), or he would have been entitled to "offer an amendment." It is apparent that the change of the year date would have no effect on the question of probable cause for the commitment. It is also clear that the appellant (the accused) had no right to amend the information. No substantial right of appellant was prejudiced by the amendment or the failure to rearraign him. This contention, based upon the amendment of the information, is not sustainable.

▮ Appellant also contends that the court erred in per-

mitting the prosecution to "play" a recording of the telephone conversation between appellant and Giovanni. The recording was played, during the trial, as a part of the prosecution's evidence, and it was replayed during the course of the deputy district attorney's argument. Appellant argues to the effect that there were no incriminatory statements by him in the recording, and, on the contrary appellant kept insisting that Giovanni repay money which appellant lent to him. As stated by appellant in his brief, the "recording was full and replete with vile language," used by appellant. He argues that the prosecution played the recording only for the purpose of prejudicing the jury against appellant. The recording of the telephone conversation was made with the consent of Giovanni. It was admissible in evidence. It could be inferred from the language used by appellant in that conversation that he was attempting to cause Giovanni to pay the loss allegedly shown by the fraudulent betting slips. The court did not err in permitting the prosecution to play the recording.

The judgment and the order denying the motion for a new trial are affirmed.

Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 16, 1960.